

## NUMBER 13-22-00061-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

---

### IN THE MATTER OF THE MARRIAGE OF SANTOS VALENTIN RAMOS AND TAYLOR LEANN SHAFER

---

### On appeal from the 377th District Court of Victoria County, Texas.

---

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Silva and Peña
Memorandum Opinion by Chief Justice Contreras**

This appeal concerns a final decree of divorce between appellant Santos Valentin Ramos and appellee Taylor Leann Shafer. Among other things, the decree designated Shafer as sole managing conservator of the parties' two children, M.C.R. and R.D.R.,[1] and it granted Ramos supervised visitation rights. Ramos argues by five issues that:

---

[1] We refer to the children by their initials to protect their identity. *See* TEX. FAM. CODE ANN. § 109.002(d).

(1) the trial court erred by granting Shafer's motion for new trial; (2) his Fifth Amendment right against self-incrimination was violated; (3) the trial court erred by "rel[ying] on knowledge from outside sources to limit [his] testimony"; (4) the conservatorship and visitation rulings are not in the children's best interests; and (5) the evidence was factually insufficient to support the visitation ruling. We affirm as modified.

## I. BACKGROUND

### A. Procedural History

The children at issue were born in October 2014 and March 2019, respectively. The record reflects that, in 2016, pursuant to pleadings filed by the Office of the Attorney General, the trial court rendered a "Child Support Review Order" with respect to M.C.R. The order named both parents joint managing conservators of M.C.R., granted Shafer the right to determine the child's residence, required Ramos to pay child support, and granted Ramos standard visitation rights.

On January 16, 2020, Ramos filed his original petition for divorce.[2] The petition recited, among other things, that "[t]here are no court-ordered conservatorships, court-ordered guardianships, or other court-ordered relationships affecting the children the subject of this suit." On September 18, 2020, the trial court signed a final decree of divorce stating that Shafer, "although duly and properly cited, did not appear and wholly made default." In accordance with the requests made in Ramos's petition, the decree named Ramos sole managing conservator of both children, granted Shafer supervised visitation rights contingent upon clean drug tests, and ordered Shafer to pay monthly child support.

---

[2] In his original petition, Ramos denied paternity of R.D.R. and requested DNA testing. However, the divorce decree states that he is the father of both children, and Ramos does not contest that finding on appeal.

The decree also required Shafer to undergo a psychological evaluation no later than September 30, 2020.

On October 6, 2020, Shafer filed a motion for new trial accompanied by an affidavit in which she averred:

> I was not aware of this case being set on September 18, 2020. I believed I was represented by Michael S. McNeely who had been hired by my grandparents, Mr. and Mrs. Dean Shafer. I did not find out until Monday, September 21, 2020, that no answer had been filed on my behalf. I did not find out until after 5 p.m., September 18, 2020, that this [c]ause had been heard on September 18, 2020. I have evidence to present to the court concerning, among other things, acts of cruelty and threats made by [Ramos] for the purpose of intimidating me. There is additional evidence relating to what disposition would be in the best interest of the children. I am requesting that a new trial be granted.

Ramos filed a response to the motion arguing in part that, because Shafer had not filed an answer in the suit, she was not entitled to receive notice of the trial setting. Ramos also contended that Shafer failed to establish the elements necessary to obtain a new trial. *See Craddock v. Sunshine Bus Lines*, 133 S.W.2d 124, 126 (Tex. 1939).

The trial court granted Shafer's new trial motion on October 13, 2020.[3] On October 16, Shafer filed an original answer and cross-petition for divorce. At trial on September 21 and November 5, 2021, Ramos and Shafer were the only witnesses.

---

[3] On October 26, 2020, Ramos filed a petition for writ of mandamus with this Court challenging the new trial order, as well as a "Motion for Emergency Stay of Court's Order" asking us to "enter an order staying [the trial court]'s October 13, 2020 order setting a temporary orders hearing when there was no written motion . . . requesting such relief." That same day, we issued an order (1) granting an emergency stay of "all trial court proceedings . . . pending further order of this Court," and (2) requesting a response to the petition from Shafer. After receiving a response, we denied the petition for writ of mandamus, and our emergency stay expired. *In re Ramos*, No. 13-20-00429-CV, 2021 WL 1177613, at *2 (Tex. App.—Corpus Christi–Edinburg Mar. 29, 2021, orig. proceeding) (mem. op.) (noting that "this Court and others have generally not applied mandamus review to new trial orders following non-jury dispositions"); *see* Tex. R. App. P. 52.10(b) ("Unless vacated or modified, an order granting temporary relief is effective until the case is finally decided."). Our emergency stay order did not affect the status of the order granting a new trial.

**B. Ramos's Testimony**

Ramos testified that he lived with Shafer for several years and financially supported Shafer since M.C.R.'s birth in 2014. However, as they had no marriage certificate and did not file a declaration of informal marriage, "[i]t was more of a common law marriage." He said he and Shafer did not hold themselves out as husband and wife, but they did file joint tax returns. They separated on January 2, 2020.

Ramos said he has had possession of R.D.R. since March 2020 and of M.C.R. since October 2020. At the time of trial, he lived in Victoria with the two children, his father, and his father's girlfriend. He stated that he obtained possession of M.C.R. when the child was removed from Shafer's home by police pursuant to a writ of attachment issued in accordance with the original default divorce decree. He explained that Shafer "refused to give [M.C.R.], so we had to wait for a few hours, and she was removed from the home, and I've had her since then." Ramos testified that, after he took possession of M.C.R., he brought the child directly to a doctor who prescribed two medications for "some kind of bacterial ringworm." Ramos said that, while he had possession of both children, he hired a nanny to watch R.D.R. four nights per week while he attended school.

Ramos said Shafer had not seen or communicated with the children since October 2020, except for two weekend visits at her home shortly before trial. Ramos insisted on being present for both visits. According to Ramos, during the first visit, Shafer "was not capable of being even awake" and "was asleep for like three days straight." Ramos said: "She'd wake up for maybe 30 minutes every four to five hours and only see the kids, you know, very temporarily, should I say."[4] At the most recent visit, he was trying to return

---

[4] Ramos initially said he never saw Shafer using drugs. Later, he said he saw her using Xanax and

4

M.C.R. to Shafer after a birthday party but Shafer "c[ould not] be reached" for five hours. Ramos said he drove up to Shafer's home and had M.C.R. knock on the door. Shafer invited them in but "became very irate" and "irritable." He agreed that, in response, he "just took the kids and went back to [his] place." He opined that "[t]he kids would be harmed" if Shafer had unsupervised weekend visitation.

Ramos asked to be named joint managing conservator with the right to determine the children's residence and for Shafer's access to the children to be "limited." Specifically, he said Shafer's visits should be supervised because he felt that the children would not be safe in her home, where she lives alone. He later said that Shafer should have unsupervised access "in the event that she gets . . . mental health evaluation . . . and attends some type of rehabilitation."

On cross-examination, Ramos testified that, when he took possession of R.D.R. in March 2020, it was "[his] weekend to have the children" but he "just never brought [R.D.R.] back due to . . . the things that [Ramos] was seeing in the home." Ramos conceded that Shafer had asked, through the parties' attorneys, to have visitation with R.D.R. prior to the two visits shortly before trial; however, Ramos denied her request. He also conceded that he was present in the courtroom when the trial court granted Shafer's motion for new trial and announced that the default divorce decree was no longer in effect. When asked what authority he was relying on for "keeping [M.C.R.] away from her mother" after the new trial was granted, Ramos stated: "It's just the grace of God." He elaborated that he "didn't really understand what was going on" and his attorney did not explain to him that the granting of the new trial "meant that there was no divorce."

_____

hydrocodone, though he did not specify when.

5

The following colloquy occurred:

Q. [Shafer's counsel]    Okay. Now, during the marriage, how many times did you assault your wife?

A. [Ramos]    I didn't.

Q.    Never?

A.    Excuse me, sir. My attorney, which is going to be Leslie [sic] Dornburg has advised me to—

THE COURT:    I'm ordering you to answer the question.

[Ramos]:    No. No, sir.

Q. [Shafer's counsel]    Okay.

[Ramos's counsel]:    Judge, I'm sorry. Can I just for clarification make sure that he's attempting to invoke the Fifth Amendment pursuant to the advice of another criminal attorney?

[Ramos]:    Yes.

[Ramos's counsel]:    I just want to make sure that record is clear.

[Ramos]:    Yes, sir.

THE COURT:    So when you're asked the question how many times you assaulted your wife, you're going to refuse to answer it and give me that information, so that I won't have any information from which to base my decision on, other than your refusal to answer the question, and then I have to take whatever I derive from that? Let me explain it.

[Ramos]:    Yes, sir.

THE COURT:    Let me explain it to where it's understood.

[Ramos]:    Yes, sir, please.

THE COURT:    You're following your attorney's advice; okay?

[Ramos]:    Yes, sir.

THE COURT:    All right. But from my seat here, if you never assaulted your wife, why would you need an

6

attorney to tell you not to answer the question? I know your attorney, and if the answer was "I never assaulted her," he wouldn't tell you not to answer that question.

It's Mr. Dornburg; right?

[Ramos]: It's, it's his wife, Ms. Terri Lynn.

THE COURT: Okay. They work together.

[Ramos]: Yes, sir.

THE COURT: Okay. But you're going to refuse to answer the question which is, during marriage, how many times did you assault your wife?

[Ramos]: I, I answered it. I said I didn't—I did not.

THE COURT: But then you said I'm not going to answer it. So I can't consider that if you have been told by an attorney not to answer it and you're not going to answer it.

[Ramos]: My attorney just said not to, not to criminalize [sic] myself in anything because—

THE COURT: Then don't answer it.

[Ramos]: Yes, sir.

[Shafer's counsel]: May I approach the witness, Your Honor?

THE COURT: You may.

Q. [Shafer's counsel]: I'm going to show you this picture. It's marked Respondent's Exhibit No. 1. . . . Were those bruises that you inflicted on your wife, Ms. Shafer?

A. No, sir.

Q. So you are answering that question?

A. (No audible response.)

Q. Well, I want to make sure when you say, "No, sir"?

A. Do you want me to just sit here quietly and just not say anything? Is that what you're wanting me to do?

7

|  |  |
|---|---|
|  | I don't understand what you're wanting. |
| THE COURT: | No, sir. . . . You have been advised by your criminal attorney not to answer any questions about any assaults that may or may not have been by you upon your wife; correct? |
| [Ramos]: | Yes, sir. |
| THE COURT: | Then just answer it that way, but that doesn't keep him from showing you a picture and saying, "Isn't this where you assaulted her"? Your answer should be . . . , "I'm not going to answer it," because you've said you're not going to answer it. |
| [Ramos]: | Yes, sir. |
| THE COURT: | If you start trying to answer it, I want you to understand, then you have to answer all his questions about an assault. |
| [Ramos]: | Yes, sir. |
| THE COURT: | Your attorney said use your privilege, Fifth Amendment; right? |
| [Ramos]: | Yes, sir. |
| THE COURT: | So if he asks you anything about assaults, you need to do what you're—well, if you want to do what your attorney said, which you should—if you go see a doctor and he tells you what to do about your health. |
| [Ramos]: | Yes, sir. |
| THE COURT: | I'm going to follow it, the same for an attorney. |
| [Ramos]: | Yes, sir. |
| THE COURT: | Okay. |
| Q. [Shafer's counsel] | I guess I'll ask you, again. This picture, Respondent's Exhibit No. 1, . . . did you inflict those bruises on Ms. Shafer? |
| A. | I'm not going to answer that. |
| Q. | Not going to answer. Okay. |

8

A.                                No contest.

THE COURT:               Don't, don't say, "No contest."

[Ramos]:                   Yes, sir.

THE COURT:               That's, that's worse than not saying anything.

[Ramos]:                   Yes, sir.

THE COURT:               No contest means you're not contesting that you bruised . . . your wife.

[Ramos]:                   Yes, sir.

THE COURT:               What you're saying is I'm not going to answer that question on advice of counsel.

[Ramos]:                   Yes, sir.

THE COURT:               I tell you what, we're going to take a 15-minute break right now. I want to make sure. I've known Mr. Dornburg, and I know his wife. I don't want him to get in trouble if he's just misunderstanding what they're saying. So I'm going to make a call to them and see what they want him to do.

[Ramos's counsel]:   Yes, sir.

THE COURT:               Okay. Y'all can be in recess for 15 minutes.

THE BAILIFF:            All rise.

(A recess was taken.)

(Other matters heard.)

THE COURT:               Over the break, I called Mr. Dornburg for basically two reasons. I think both Mr. Dornburg and [Ramos's counsel] are placed in a very delicate position, in that both are giving their client good legal advice. It's just that the legal advice given by Mr. Dornburg is only taking into consideration alleged criminal matters that could be filed and the information—the advice given by [Ramos's counsel] is as it relates to testimony at this hearing.

As a result of that, Mr. Dornburg told me he wanted—his advice to his client to remain and he

9

does not want his client answering any questions that could put him in a position of being criminally liable.

So what I will tell you, sir, is on any questions asked about assaults and/or pictures, he wants you to answer, "On the advice of counsel, I'm not going to answer that question." Okay?

[Ramos]: Yes, sir.

THE COURT: All right. I know you can go against it, but Mr. Dornburg knows what it is, [Ramos's counsel] knows what it is. Both of your attorneys have a vested interest in advising you both civilly by [Ramos's counsel] and criminally by Mr. Dornburg. And so I'm going to make sure that—[Ramos's counsel] is here to make sure that you follow his advice, and I'm going to make sure that you don't not follow Mr. Dornburg's advice as it relates to potential criminal action that could or could not be levied against you.

So if you'll have a seat up here, again.

. . . .

Q. [Shafer's counsel] Mr. Ramos, I'm going to show you Respondent's Exhibit No. 2 and ask you if you inflicted those bruises on your spouse, Taylor Shafer?

A. I'm not going to answer that.

Q. Okay.

THE COURT: On advice of counsel.

[Ramos]: On advice of counsel.

Ramos then answered the same with respect to eleven other photographs.[5]

On re-direct examination, Ramos testified that the Department of Family and

Protective Services (the Department) had been involved with the family twice previously.

---

[5] Only eight of the thirteen photographs inquired about are contained in the reporter's record. They each depict Shafer with bruises and blood on her face and head.

10

First, in 2016 or 2017, he was accused of abuse and Shafer was accused of drug use. Ramos said a family service plan was issued, and he took parenting classes, but the case "didn't really ever get resolved." Another time, on Christmas in 2018, Shafer "threw bricks at the window, took an axe to the door[,] and drove her car in to the side of [Ramos's] dad's house." He said M.C.R. was removed from Shafer's custody after that incident, and Shafer was charged with criminal mischief and child endangerment, though the charges were later dropped. On re-cross examination, Ramos denied knowing that the Department had ruled out allegations against Shafer for neglect.

At the November 5, 2021 hearing, Ramos stated that Shafer had asked to visit M.C.R. since the last hearing on September 21. He denied that he prevented that from happening. Instead, he agreed that "if [Shafer] had come to [his] house, [he] would have turned [M.C.R.] over to her." However, he stated that he "would not have given [R.D.R.] up" because "[t]here's no orders" applicable to him.

Ramos acknowledged that he had "six or seven" prior criminal convictions, including at least one felony.

## C.    Shafer's Testimony

Shafer testified that, when Ramos came to pick up R.D.R. for visitation in March 2020, he "kicked in the back door" and she called the police "because [she] knew he was going to get physical with [her]." According to Shafer, Ramos "got in the car, and he left with the kids." She said she did not see R.D.R. from that time up until the week of trial, and she did not see M.C.R. from October 2020 until the week of trial. She said she attempted to contact Ramos to see her children but was unsuccessful.

Shafer stated that Ramos has beaten her in the past, twice requiring her to be

11

hospitalized. She confirmed that the photographs which were entered into evidence depicted the injuries she suffered as a result of the assaults. She also identified a photo of Ramos holding a handgun, which she said Ramos sent to her after she reported one of the instances of abuse to police; she believed that he sent it to intimidate her. Shafer acknowledged that there was a period of time when she would not allow Ramos to see M.C.R.; she explained that was because "the past few times that he had her, she came home with a rash."

Shafer said she is not currently employed and that her grandparents, who raised her, would be available to help take care of the children. She agreed that she would let M.C.R. stay in the preschool that Ramos enrolled her in because "[s]he's already been mixed up enough." When asked why she did not attend the initial divorce hearing in September 2020, Shafer explained that her previous attorney "didn't let us know anything." She said that, when the divorce was filed, she believed that the lawyer representing her in the OAG case was also representing her in the divorce. She said she provided a copy of the divorce petition to that prior attorney. When she learned that a default decree had been rendered, she hired her present counsel and filed a motion for new trial.

According to Shafer, when Ramos brought the children to her for a weekend visitation shortly before trial, she had an "upper respiratory infection" and a "tooth infection" and was taking antibiotics. She stated she takes antidepressants and Xanax as prescribed by a physician, but she denied that they cause her to fall asleep. She acknowledged smoking marijuana while she was pregnant "due to [her] morning

12

sickness." She said she complied with the Department's service plan.[6]

## D.    Final Decree of Divorce

Following testimony, the trial court pronounced its ruling in open court. On November 16, 2021, the trial court signed a final decree of divorce naming Shafer as sole managing conservator of the children and ordering Ramos to pay monthly child support. As to Ramos's visitation rights, the decree stated:

> IT IS ORDERED that the conservators shall have possession of the child at times mutually agreed to in advance by the parties, and, in the absence of mutual agreement, it is ORDERED that the conservators shall have possession of the child under the specified terms set out in this Standard Possession Order.
>
> . . . .
>
> [Ramos] shall have supervised visitation on the first, third, and fifth Saturdays of each month from 10 a.m. until 4 pm. These visitations will be supervised by Dean Shafer, Sheryl Shafer or Dean and Sheryl Shafer.
>
> Nothwithstanding [sic] any agreement, overnight visitation between [Ramos] and the children . . . will not occur until at least six months from November 5, 2021.
>
> The supervised Saturday visitation will begin November 20, 2021.
>
> Before overnight visitation occurs, [Shafer] must communicate with her attorney . . . concerning this matter.
>
> [Ramos] must obtain a mental health evaluation before overnight visitation occurs and sign a medical waiver and [Ramos] shall provide the results of the evaluation to [the parties' attorneys].

---

[6] Shafer testified that she is "a Native American" and her "affiliation" is Osage. When asked whether she was aware that she "could assert [her] Native American right to have a Native American tribunal hear this and not have this Court hear the case," Shafer replied: "I don't know really much about it." She later said she did not want the matter to be heard by the tribal justice system.

We observe that there is nothing in the record indicating that Shafer is a "member of an Indian tribe" or that either child is an "Indian child" as defined in the federal Indian Child Welfare Act. *See* 25 U.S.C. § 1912(a) (setting forth certain notice requirements "where the court knows or has reason to know that an Indian child is involved" in a child custody case); *see also id.* § 1903(4) (defining "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) [] eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

13

**Based on [Ramos]'s failure to deliver the children to [Shafer] by 5 p.m., November 5, 2021, there will be no visitation with the children by [Ramos] until [Ramos] explains his reason for the late delivery of the children.**

This appeal followed.

## II.    DISCUSSION

### A.    Motion for New Trial

By his first issue, Ramos argues the trial court abused its discretion by granting Shafer's motion for new trial. The trial court has general discretion to grant a new trial for "good cause," though this discretion has limits. *See* TEX. R. CIV. P. 320; *In re Davenport*, 522 S.W.3d 452, 456 (Tex. 2017) (orig. proceeding); *In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 210 (Tex. 2009) (orig. proceeding). We review a ruling on a motion for new trial for abuse of that discretion. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010); *In re R.R.*, 209 S.W.3d 112, 114 (Tex. 2006) (per curiam); *HST Gathering Co. v. Motor Serv., Inc.*, 683 S.W.2d 743, 745 (Tex. App.—Corpus Christi–Edinburg 1984, no writ) ("[T]he question of whether to set aside a default judgment is addressed to the sound discretion of the trial court and will be overturned only upon a showing of abuse of discretion."). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Crawford v. XTO Energy, Inc.*, 509 S.W.3d 906, 911 (Tex. 2017).

In *Craddock*, the Texas Supreme Court held that a trial court should set aside a default judgment and order a new trial in any case in which: (1) the failure of the defendant to answer before judgment was neither intentional nor the result of conscious indifference on her part, but was due to mistake or accident; (2) the motion for new trial sets up a meritorious defense; and (3) the motion is filed at a time when its granting would occasion

no delay or otherwise work an injury to the plaintiff. *Craddock*, 133 S.W.2d at 126. Ramos contends that the court erred because Shafer did not establish any of these elements. We address each in turn.

### 1.      No Conscious Indifference

The movant's burden as to the first *Craddock* element has been satisfied "when the factual assertions, if true, negate intentional or consciously indifferent conduct by the defendant and the factual assertions are not controverted." *In re R.R.*, 209 S.W.3d at 115 (citing *Fidelity & Guar. Ins. v. Drewery Constr. Co.*, 186 S.W.3d 571, 576 (Tex. 2006) (per curiam)). In determining if the movant's factual assertions are controverted, the court looks to all the evidence in the record. *Id.* (citing *See Dir., State Emps. Workers' Comp. Div. v. Evans*, 889 S.W.2d 266, 269 (Tex. 1994)).

Failing to file an answer intentionally or due to conscious indifference means "the defendant knew [she] was sued but did not care." *Id.* (quoting *Fidelity & Guar. Ins.*, 186 S.W.3d at 576). When determining whether the movant's failure to file an answer was intentional or due to conscious indifference, a court looks to the knowledge and acts of the movant. *Id.* (citing *Evans*, 889 S.W.2d at 269). "Not understanding a citation and then doing nothing following service does not constitute a mistake of law that is sufficient to meet the *Craddock* requirements." *Id.* (citing *Bank One, Tex., N.A. v. Moody*, 830 S.W.2d 81, 84 (Tex. 1992)). Nevertheless, "some excuse, although not necessarily a good one, will suffice to show that a [movant]'s failure to file an answer was not because the [movant] did not care." *Id.* (quoting *Fidelity & Guar. Ins.*, 186 S.W.3d at 576).

In her affidavit accompanying her new trial motion, Shafer averred that she believed she was represented in the divorce by her attorney in the OAG proceeding, and

15

she did not "find out" that no answer had been filed in the divorce case until after the default decree had been issued. At trial, she testified that she sent a copy of Ramos's divorce petition to her attorney in the OAG proceeding, and she hired new counsel as soon as she found out about the default decree. We conclude that these alleged facts, which are not controverted anywhere in the record, established that Shafer's failure to file an answer was not intentional or the result of conscious indifference. Therefore, the first *Craddock* factor was established.

### 2.    Meritorious Defense

"A meritorious defense has been set up so as to meet the second *Craddock* prong if the facts alleged in the movant's motion and supporting affidavits set forth facts which in law constitute a meritorious defense, regardless of whether those facts are controverted." *Id.* at 116 (citing *Evans*, 889 S.W.2d at 270); *see Ivy v. Carrell*, 407 S.W.2d 212, 214 (Tex. 1966) ("The motion must allege [f]acts which in law would constitute a defense to the cause of action asserted by the plaintiff, and must be supported by affidavits or other evidence proving prima facie that the defendant has such meritorious defense.").

In *In re R.R.*, the Texas Supreme Court considered whether the denial of a new trial was proper in a proceeding to terminate parental rights. 209 S.W.3d at 116. In considering whether the movant had established a meritorious defense, the Court emphasized that termination of parental rights may be ordered only if it is in the best interest of the child. *Id.* (citing Tex. Fam. Code Ann. § 161.001(2)). The Court therefore considered the movant's factual assertions in light of their effect on the child's best interests. *See id.* (concluding that movant met his burden to satisfy the second *Craddock*

16

element). The best interest of the children is also the primary consideration in this case. *See* TEX. FAM. CODE ANN. § 153.002.

Shafer stated in her affidavit that "[she] ha[s] evidence to present to the court concerning, among other things, acts of cruelty and threats made by [Ramos] for the purpose of intimidating me" as well as "additional evidence relating to what disposition would be in the best interest of the children." Ramos claims that these averments are insufficient to support a new trial because, though "Shafer states she has 'evidence,' [she] never states what the evidence is." He argues that "[Shafer] cannot merely state she has a meritorious defense[;] she must provide details of what the meritorious defense is." *See In re Britt*, 529 S.W.3d 93, 96–97 (Tex. App.—Texarkana 2016, orig. proceeding) (finding, where defendant raised defense of limitations for the first time at the motion for new trial hearing, that defendant failed to raise a meritorious defense).

We disagree. Although Shafer's affidavit is neither detailed nor extensive, it alleges that Ramos committed "acts of cruelty and threats . . . for the purpose of intimidating" her. Such facts, if true, would be properly considered in the best interest analysis. *See Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). Thus, Shafer satisfied her burden to "allege facts," supported by affidavit, which would establish a defense to the action. *See In re R.R.*, 209 S.W.3d at 116. Ramos cites no authority, and we find none, requiring Shafer to specify the nature of the evidence she intended to introduce to support those alleged facts. We conclude the trial court acted within its discretion in implicitly determining that Shafer's new trial motion set forth a meritorious defense.

### 3.    No Injury to Non-Movant

We finally consider whether the new trial motion and affidavit established that a

new trial would "occasion no delay or otherwise work an injury to" Ramos. *See Craddock*, 133 S.W.2d at 126.

Shafer's new trial motion generally alleged that "[t]he granting of a new trial would not injure [Ramos]." Ramos claims that this statement is "tantamount to no evidence" because it is conclusory. He also observes correctly that Shafer's affidavit did not address the issue of whether Ramos would be injured by the granting of a new trial.[7]

Ramos further suggests that Shafer's motion was deficient because it did not contain "[t]he standard language to be included in a motion for new trial [as] set forth" in *Strackbein v. Prewitt*, 671 S.W.2d 37, 39 (Tex. 1984) (finding third *Craddock* element satisfied where movant stated in new trial motion "that he had offered to reimburse [appellant] for all costs incurred through the hearing on the motion for new trial"). *See HST Gathering Co.*, 683 S.W.2d at 745 (same where "appellant, both in [its] amended motion for new trial and at the evidentiary hearing, announced that it was ready to go to trial immediately and offered to pay reasonable attorney's fees to appellee in connection with their appearance and the taking of the default judgment"). But the Texas Supreme Court has held that the language in *Strackbein* is not a prerequisite to the granting of a new trial. *See Angelo v. Champion Rest. Equip. Co.*, 713 S.W.2d 96, 98 (Tex. 1986). ("Failure to offer reimbursement should not in every instance preclude the granting of a new trial. . . . The goal to be achieved is to not injure the plaintiff or unduly delay him by granting the motion.").

Ramos did not file a response to Shafer's new trial motion, and he points to nothing

---

[7] Ramos does not argue on appeal that the delay caused by the granting of a new trial actually caused him injury, nor does he argue that the delay or the granting of a new trial was contrary to the best interests of the children in any way.

in the record controverting the statement made in the motion that "[t]he granting of a new trial would not injure [Ramos]." *See Cliff v. Huggins*, 724 S.W.2d 778, 779 (Tex. 1987) ("[O]nce the defendant has alleged that the granting of a new trial will not delay or otherwise injure the plaintiff, the burden of going forward with proof of injury shifts to the plaintiff for these are matters peculiarly within the plaintiff's knowledge."). Further, Ramos acknowledges that Shafer's attorney stated at the new trial hearing that he was ready to go forward with trial.[8] *See Angelo*, 713 S.W.2d at 98 (noting that, in evaluating new trial motions, "the courts have looked more favorably upon defendants ready, willing and able to go to trial almost immediately"); *see also Cliff*, 724 S.W.2d at 779. Under these circumstances, we cannot say the trial court abused its discretion in determining that the third *Craddock* element was satisfied.

Because the three *Craddock* elements were satisfied by Shafer's motion and affidavit, the trial court did not err in granting a new trial. We overrule Ramos's first issue.

## B.    Fifth Amendment Violation

By his second issue, Ramos argues the court erred by denying him the right to "selectively invoke" his Fifth Amendment right against self-incrimination. More specifically, Ramos contends the trial court abused its discretion by: (1) incorrectly instructing him that he could not "selectively answer some questions, but take the 5th Amendment with respect to other questions"; and (2) preventing Ramos from answering questions which he "believed did not implicate him criminally." He asserts that, "[b]y requiring Ramos to claim the privilege as to each question asked with respect to the photographs, the trial court effectively excluded relevant evidence that Ramos did not

---

[8] The record does not contain any transcript of a new trial hearing.

19

assault Shafer." According to Ramos, "forcing someone to apply the privilege without allowing them the opportunity to waive it in order to deny liability (or guilt) denies the witness the opportunity to defend against certain claims."

The United States Constitution and the Texas Constitution provide that a person may not be compelled to testify or give evidence against himself in a criminal case. *See* U.S. CONST. amend. V; TEX. CONST. art. I, § 10; *Maness v. Meyers*, 419 U.S. 449, 464 (1975). This privilege also extends to civil cases "wherever the answer might tend to subject [the witness] to criminal responsibility." *Tex. Dep't of Pub. Safety Officers Ass'n v. Denton*, 897 S.W.2d 757, 760 (Tex. 1995) (quoting *McCarthy v. Arndstein*, 266 U.S. 34, 40 (1924)); *In re Speer*, 965 S.W.2d 41, 45 (Tex. App.—Fort Worth 1998, orig. proceeding). Unlike in criminal proceedings, the fact-finder in a civil case is permitted "to make negative inferences based upon the assertion of the privilege." *Denton*, 897 S.W.2d at 760 (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)). Further, the assertion of the privilege against self-incrimination in a civil case "must be raised in response to each specific inquiry or it is waived." *See In re Ferguson*, 445 S.W.3d 270, 275 (Tex. App.—Houston [1st Dist.] 2013, orig. proceeding) (noting that "blanket assertions of the privilege in civil cases are impermissible"); *In re Speer*, 965 S.W.2d at 46 (noting that, "if a criminal defendant voluntarily states a part of the testimony, he waives his right against self-incrimination and cannot afterwards assert the privilege to suppress other testimony even if that testimony would incriminate him," but this "same reasoning does not apply in civil cases").

The record reflects that, when Shafer's counsel first asked Ramos how often he assaulted his wife, Ramos replied, "I didn't." Ramos then explained that his criminal

20

defense attorney had advised him not to answer questions which may "criminalize" [sic] him. After a meandering discussion with the trial court concerning the precise wording required to invoke the privilege, Ramos eventually declined to answer any further questions about whether he caused Shafer's injuries as depicted in the admitted photographs. During this discussion, the trial court remarked to Ramos: "If you start trying to answer it, . . . then you have to answer all his questions about an assault."

Ramos argues that "there were several times" when he "wanted to answer" counsel's questions regarding the photos with "I didn't do that," but "the court did not allow him the opportunity to deny the conduct." He claims that he was "denied a proper defense" for this reason. The record does not support these assertions. Ramos's initial testimony that he "didn't" assault Shafer appears in the trial transcript and was neither objected to nor struck from the record. It is true that Ramos technically retained the right to selectively invoke his Fifth Amendment privilege as to each subsequent question, *see In re Ferguson*, 445 S.W.3d at 275, and the trial court misstated the law to the extent it instructed Ramos otherwise. But there is no indication in the record that Ramos actually intended to selectively invoke the privilege or that he would have done so if the trial court had not provided the inaccurate instruction. *See* TEX. R. APP. P. 44.1(a) (standard for reversible error in civil cases).[9] In particular, Ramos does not dispute that his criminal defense attorney in fact advised him to invoke the privilege as to "*any* questions about

---

[9] In arguing that he suffered harm from the trial court's actions, Ramos states:

> Because the court would not allow Ramos to deny that he had caused the injuries to Shafer as shown in her exhibits, and instructed him to invoke his right against self-incrimination, on every question asked regarding the p[h]otographs, as stated above, the court was allowed to make negative inferences from Ramos'[s] failure to testify.

Ramos does not argue that the trial court's incorrect instruction probably prevented him from presenting the case to this Court. *See* TEX. R. APP. P. 44.1(a)(2).

assaults and/or pictures" (emphasis added), nor does he dispute that he intended to follow his criminal attorney's advice. Moreover, Ramos was represented by competent counsel at the divorce trial, and counsel made no objection at any point concerning opposing counsel's questions, Ramos's answers, or the trial court's remarks. *See* TEX. R. APP. P. 33.1(a)(1) (regarding preservation of error for appeal).

For the foregoing reasons, we overrule Ramos's second issue.

## C.    Improper Judicial Conduct

Ramos's third issue also concerns the unusual discussion with the trial court regarding his Fifth Amendment rights. Ramos argues that, by independently contacting his criminal defense attorney to ask what his advice to Ramos would be concerning invocation of the privilege, the trial court "rel[ied] on extrajudicial sources" and violated his due process rights. He cites case law concerning improper judicial conduct and disqualification. *See Kemp v. State*, 846 S.W.2d 289, 305–06 (Tex. Crim. App. 1992) ("Bias may be a ground for disqualification only when it is shown to be of such nature, and to such extent, as to deny the defendant due process of law. . . . [B]efore alleged bias becomes sufficient to warrant the disqualification of a judge, it 'must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.'"); *see also Shabazz v. State*, No. 05-20-00002-CR, 2021 WL 2943924, at *9 (Tex. App.—Dallas July 12, 2021, pet. ref'd) (mem. op., not designated for publication) ("To reverse a judgment on the ground of improper conduct or comments of the judge, we must find (1) that judicial impropriety was in fact committed, and (2) probable prejudice to the complaining party." (citing *Dockstader v. State*, 233 S.W.3d 98, 108 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd))).

22

All parties have a due process right to a fair and impartial trial before a neutral judge. *Ellason v. Ellason*, 162 S.W.3d 883, 887 (Tex. App.—Dallas 2005, no pet.); *Earley v. State*, 855 S.W.2d 260, 262 (Tex. App.—Corpus Christi–Edinburg 1993, no pet.) (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973)); *see* U.S. CONST. art. XIV; TEX. CONST. art. I, § 13. Accordingly, "[a] judge should not act as an advocate or adversary for any party." *Dockstader*, 233 S.W.3d at 108. But we presume the trial judge was neutral and detached "in the absence of a clear showing to the contrary." *Earley*, 855 S.W.2d at 262. And even constitutional complaints may be waived by failure to comply with rules regarding preservation of error. *See In re C.T.*, 749 S.W.2d 214, 217 (Tex. App.—San Antonio 1988, no writ).

Here, as noted, Ramos was represented by competent counsel at the divorce trial, and counsel did not object to the trial court's comments or actions or move for its recusal. *See* TEX. R. APP. P. 33.1(a)(1). Even assuming the issue has been preserved for our review, we cannot conclude that a "clear showing" of partiality or bias against Ramos has been made in this case. *See Earley*, 855 S.W.2d at 262. The record reflects that Ramos first denied that he assaulted Shafer, then attempted to invoke his Fifth Amendment privilege to avoid answering questions about any such assaults. In an apparent attempt to resolve the confusion about Ramos's intentions, the trial court—off the record and outside the presence of the parties and their attorneys—took it upon himself to privately contact Ramos's criminal attorney, to whom the judge was personally acquainted. The trial court later stated on the record that Ramos's criminal counsel's advice was for Ramos to invoke the Fifth Amendment as to "any questions asked about assaults and/or pictures."

The claimant bears the burden to explain how the trial judge's allegedly improper comments or conduct were incurable so as to excuse the claimant's failure to preserve error. *In re Commitment of Fontenot*, 536 S.W.3d 906, 918 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (citing *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam)); *In re Commitment of Stuteville*, 463 S.W.3d 543, 557 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). Ramos has failed to satisfy that burden. He does not address preservation of error in his brief; in particular, he does not argue that preservation of error was unnecessary because the error was "fundamental" or under any other legal rationale. *See* TEX. R. APP. P. 38.1(i). Moreover, considering the entire record, we cannot say that the trial court's conduct reveals a "deep-seated favoritism or antagonism that would make fair judgment impossible." *See Liteky v. United States*, 510 U.S. 540, 555 (1994) (noting that opinions a judge forms during a trial do not establish judicial bias so as to require recusal "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible"). The trial court's actions were prompted by Ramos's obvious confusion as to whether to invoke the privilege, and it appears that they were earnestly intended to protect Ramos from the potential penal consequences of his incriminating himself in the divorce proceeding.

Ramos emphasizes that, in pronouncing its ruling, the trial court explicitly noted that it was "going to take [Ramos's refusal to answer questions regarding assault] into consideration." But we do not agree with Ramos that the result of the proceeding would have probably been different had the trial court refrained from taking the complained-of actions. *See Dockstader*, 233 S.W.3d at 108 (providing that, to obtain reversal on the basis of improper judicial conduct, the appellant must show that he probably suffered

24

prejudice); *see also* TEX. R. APP. P. 44.1(a). Even if the trial court had never contacted Ramos's defense attorney, the evidence before the trial court on the substantive issues would have included both Ramos's initial denial of assaulting Shafer *and* his subsequent refusal to answer questions regarding assault on Fifth Amendment grounds—from which it is undisputed that the court was permitted to draw a negative inference. *See Denton*, 897 S.W.2d at 760 (citing *Baxter*, 425 U.S. at 318).

With all this said, we are troubled by the trial court's conduct. At best, the behavior exhibited by the court in this case is highly unorthodox and bears the appearance of impropriety. We recognize and appreciate the stress associated with a trial of this nature; however, all judges are bound by rules of conduct, one of which states:

> A judge shall not initiate, permit, or consider *ex parte* communications or other communications made to the judge outside the presence of the parties between the judge and a party, an attorney, a guardian or attorney ad litem, an alternative dispute resolution neutral, or any other court appointee concerning the merits of a pending or impending judicial proceeding.

TEX. CODE JUD. CONDUCT Canon 3(B)(8), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. B. By initiating *ex parte* communication with Ramos's criminal attorney, the trial court in this case arguably violated this rule and failed to exhibit the attitude of impartiality that is required of all jurists. *See id.* Canon 2(A) (stating that a judge "should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary"); *see also Lagrone v. State*, 209 S.W. 411, 415 (Tex. Crim. App. 1919) ("The law contemplates that the trial judge shall maintain an attitude of impartiality throughout the trial").[10]

---

[10] We observe that this is not the first time this Court has deemed it necessary to admonish this particular trial judge for violating the code of conduct in a family law case. *See In re A.T.M.*, No. 13-21-00008-CV, 2021 WL 2584402, at \*17–19 (Tex. App.—Corpus Christi–Edinburg June 24, 2021, no pet.)

Ramos's third issue is overruled.

## D.     Conservatorship

By his fourth issue, Ramos argues that the trial court "failed to consider the best interest of the children" in granting Shafer sole managing conservatorship of M.C.R. and R.D.R. and in "severely limit[ing]" his visitation rights.

### 1.     Standard of Review and Applicable Law

The trial court is afforded great discretion when determining issues relating to conservatorship, including visitation. *Gardner v. Gardner*, 229 S.W.3d 747, 753–54 (Tex. App.—San Antonio 2007, no pet.); *Dennis v. Smith*, 962 S.W.2d 67, 70 (Tex. App.—Houston [1st Dist.] 1997, pet. denied). To determine whether the trial court abused its discretion, we review the "evidence in a light most favorable to the court's decision and indulge every legal presumption in favor of its judgment." *In re J.I.Z.*, 170 S.W.3d 881, 883 (Tex. App.—Corpus Christi–Edinburg 2005, no pet.). "[T]he trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *In re P.M.G.*, 405 S.W.3d 406, 410 (Tex. App.—Texarkana 2013, no pet.) (quoting *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.)). Thus, we "defer to the trial court's judgment in matters involving factual resolutions and any credibility determinations that may have affected those resolutions." *Id.*

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."

---

(mem. op.) (finding trial court made several improper comments but affirming because appellant did not object at trial and the record did "not reveal that the trial court developed any antagonism or bias against [appellant] based on prior proceedings in an unrelated case").

TEX. FAM. CODE ANN. § 153.002; *In re Marriage of Christensen*, 570 S.W.3d 933, 938 (Tex. App.—Texarkana 2019, no pet.). Factors considered in the best interest inquiry include: (1) the desires of the children; (2) the emotional and physical needs of the children now and in the future; (3) the emotional and physical danger to the children now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the children; (6) the plans for the children by the individuals seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371–72. "Proof of best interest is not limited to these factors, nor do all factors always apply in every case." *In re S.A.H.*, 420 S.W.3d 911, 926 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

## 2. Analysis

As to the first *Holley* factor, there is no evidence in the record concerning the desires of the children, who were six and two years old, respectively, at the time trial concluded. *See In re R.S.D.*, 446 S.W.3d 816, 818, 820 (Tex. App.—San Antonio 2014, no pet.) (finding that the child, who was "almost four years old" at the time of trial, was "too young to have stated his desires"). Further, there is no evidence that either child has any specific emotional or physical needs beyond those typical of children their age.

Regarding emotional and physical danger, Ramos testified that he was accused of abuse and Shafer was accused of drug use in 2016 or 2017. In 2018, M.C.R. was removed from Shafer's custody after Shafer allegedly became violent at Ramos's father's house. Ramos testified that, when Shafer visited with the children shortly before trial,

Shafer "was asleep for like three days straight." Shafer acknowledged that she takes prescribed medication for depression and anxiety, and that she used marijuana while she was pregnant; Ramos conceded that he was convicted of marijuana possession about ten years ago. Both parties testified that, after periods of possession with the other parent, M.C.R. had dermatological problems; aside from that, however, there was no evidence that either child suffered physical mistreatment while in the custody of either parent.

The evidence in the record also includes eight photographs showing Shafer with bruises and blood on her head and face; Shafer's testimony that Ramos caused those injuries; Ramos's initial denial that he caused those injuries; and Ramos's subsequent refusal to answer questions regarding the photographs on Fifth Amendment grounds. The trial court could have disbelieved Ramos's denials. *See In re P.M.G.*, 405 S.W.3d at 410. And as noted, the court could have inferred from Ramos's refusals to answer that, had he answered, he would have incriminated himself. *See Denton*, 897 S.W.2d at 760 (citing *Baxter*, 425 U.S. at 318).

As to parenting abilities, the record reflects that the eldest child, M.C.R., lived with both parents from the time of her birth in 2014 until 2019. During that time, an order was in effect granting Shafer the right to designate M.C.R.'s residence and granting Ramos standard visitation. In March 2020, Ramos took possession of R.D.R., who was one year old at the time, but he refused to return him to Shafer "due to . . . the things [he] was seeing in [Shafer's] home." Ramos then took possession of M.C.R. later in 2020 pursuant to the default divorce decree. However, even though he was present in the courtroom when the trial court granted Shafer's motion for new trial and declared that the default decree was no longer in effect, Ramos did not return possession of M.C.R. to Shafer, and

28

he refused to allow Shafer to visit R.D.R. Ramos testified that he would have allowed Shafer to visit M.C.R. if she had come to his house in between the trial hearings.

There was scant evidence concerning the parties' plans for the children or the stability of their homes. Neither parent was gainfully employed at the time of trial. Shafer testified that she would keep M.C.R. in the same preschool that Ramos enrolled her in, and that her grandparents would help raise the children.

Considering all the evidence, we cannot conclude that the trial court abused its discretion in determining that it was in the best interest of both children for Shafer to be named sole managing conservator and for Ramos to have supervised visitation. The trial court clearly found Shafer to be the more credible witness, and we must defer to its credibility determinations. *See In re P.M.G.*, 405 S.W.3d at 410; *see also* TEX. FAM. CODE ANN. § 263.307(b)(12)(E) (stating that, in determining whether a parent is willing and able to provide the child with a safe environment, the court should consider "whether the child's family demonstrates adequate parenting skills, including providing the child . . . with . . . protection from repeated exposure to violence even though the violence may not be directed at the child"); *In re R.S.D.*, 446 S.W.3d at 820 (noting that "a trier of fact may measure a parent's future conduct by her past conduct" in evaluating the child's best interest). We overrule Ramos's fourth issue.

## E.    Visitation

Finally, we consider Ramos's fifth issue, by which he contends that there was factually insufficient evidence to support the following paragraph contained in the decree: "Based on [Ramos]'s failure to deliver the children to [Shafer] by 5 p.m., November 5, 2021, there will be no visitation with the children by [Ramos] until [Ramos] explains his

reason for the late delivery of the children."

In a custody case, a challenge to the sufficiency of the evidence is not a separate ground of error, but instead is a relevant factor to consider in assessing whether the trial court abused its discretion. *In re R.T.K.*, 324 S.W.3d 896, 899 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). To assess this factor, "we consider whether the trial court had sufficient information upon which to exercise its discretion and whether it erred in its application of that discretion." *In re M.M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.). A trial court's decision is supported by factually insufficient evidence only if it is "so against the great weight and preponderance of the evidence that it is manifestly unjust, shocks the conscience, or clearly demonstrates bias." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (citing *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)).

Ramos argues that the evidence was insufficient to support the challenged paragraph, and that due to this ruling, he "has not been able to see his children at all" in the sixteen months since the decree was issued.[11] We agree that the paragraph is supported by factually insufficient evidence. There is no evidence before the trial court that Ramos "fail[ed] to deliver the children to [Shafer] by 5 p.m. [on] November 5, 2021," as stated in the decree.[12] Indeed, the record reflects that the divorce trial concluded prior to that time. The decree's finding in this regard is against the great weight and preponderance of the evidence and its prohibition of visitation "until [Ramos] explains his

---

[11] Ramos also claims that the paragraph "is too vague and ambiguous to even be enforceable." However, he does not support this claim with argument or references to the record or authority. *See* Tex. R. App. P. 38.1(i).

[12] In her brief, Shafer states without reference to the record that "[t]he inclusion of [the subject paragraph] has not prevented [Ramos] from seeing the children." She further claims that the paragraph "is significant because this was the initial time that [Ramos] was to return the children to [Shafer] after the Court's ruling." However, she does not point to any evidence in the record supporting the paragraph.

reason for the late delivery of the children" is manifestly unjust. *See id.*[13]

We sustain Ramos's fifth issue and modify the judgment to delete the paragraph stating that "there will be no visitation with the children by [Ramos] until [Ramos] explains his reason for the late delivery of the children." Visitation shall proceed according to the schedule set forth in the remainder of the decree.

### III.   CONCLUSION

The judgment is affirmed as modified herein. *See* TEX. R. APP. P. 43.2(b).

DORI CONTRERAS
Chief Justice

Delivered and filed on the
4th day of May, 2023.

---

[13] Ramos additionally complains by this issue that the written decree did not comport with the trial court's oral ruling following trial. But "[i]n civil cases, when a trial court's oral pronouncement conflicts with a written judgment, the written judgment prevails." *In re I.L.*, 580 S.W.3d 227, 244 (Tex. App.—San Antonio 2019, pet. dism'd); *In re L.G.R.*, 498 S.W.3d 195, 206 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).